## CROCKETT v. ROBINSON.

The rule in *Shelley's Case* was adopted in this State as part of the common law, and continued in force here until it was abolished as to devises by statute in 1843.

Joshua Crockett, in 1814, made a devise in the following terms: "I give to my two sons, Joshua Crockett and Chase Crockett, all that farm, on which they now live, to be equally divided between them and their heirs, if they have any lawful heirs at the time of their decease; and if they have no lawful heirs at the time of their decease, the above named farm to be equally divided between the children that my daughter Sarah Crockett had by Thomas Rawlins:" *Held:*

That by the term "lawful heirs" such persons were intended as should be the heirs of Joshua and Chase Crockett in the line of descent from them, whether such persons were children or were remote descendants.

That Joshua and Chase Crockett took under this devise as tenants in common, and that by operation of the rule in *Shelley's Case* an estate of inheritance vested in each of them upon the death of the devisor.

That as estates tail were abolished in this State at the time of this devise, Joshua and Chase Crockett took each an estate in fee simple in one undivided half of the land.

WRIT of entry dated Feb. 3, 1865, to recover one undivided fourth part of a tract of land in Meredith, being the westerly half of a tract of land called the Crockett place. Plea, the general issue.

For the purposes of this case the parties agree upon the following facts :

Joshua Crockett, senior, was the owner of the whole lot, of which the demanded premises constitute the western half, on the 15th day of December, 1814, and from that time until his decease in January, 1815. On said 15th day of December, said Joshua made and executed his last will and testament in due form, in which the following is the first bequest :

"I give and bequeath to my two sons, Joshua Crockett and Chase Crockett, all that farm on which they now live, to be equally divided between them and their heirs, if they have any lawful heirs at the time of their decease, and if they have no lawful heirs at the time of their decease, the farm above named to be equally divided between the children that my daughter Sarah Crockett had by Thomas Rawlins, and I also give and bequeath to my two sons, Joshua Crockett and Chase Crockett, five dollars each, to be paid in one year after my decease in money, to be paid by my executor hereinafter named."

The demanded premises are the western half of the farm thus described.

The testator, Joshua Crockett, senior, died in January, 1815, and his will was duly proved and allowed at the March Term, 1815, of the probate court in Strafford county. The two sons occupied the farm from the death of the testator; Chase occupying the westerly half and Joshua, junior, the easterly half thereof, by a parol agreement or understanding between them until Sept. 30, 1844, when Joshua Crockett, jr., quitclaimed the westerly half to Chase Crockett and his heirs, by his deed of that date in common form, duly executed, acknowledged the same day and recorded Oct. 9, 1844. Sept. 28, 1846, Chase Crockett, in consideration of $375, conveyed the demanded premises to the defendant Robinson, and one Edward Chase, whose title the other

defendant now holds, by deed of warranty in common form, duly executed, acknowledged the same day and recorded Oct. 3, 1846, in which deed the wife of said Chase Crockett released her dower in said premises. On the same day the defendant Robinson and said Edward Chase conveyed to said Chase Crockett a house and tract of land in Meredith, and took from said Chase Crockett a mortgage thereof conditioned that "he shall well and truly perform and keep his covenants of warranty of a certain piece of land described in his deed bearing even date herewith to said Chase and Robinson, their heirs and assigns and shall save them harmless from all costs and trouble which may arise by reason of his not having a good title, and until he shall satisfy them his title is good."

Joshua Crockett, jr., died March 8, 1848, leaving four children of whom the plaintiff is one. Said children in November following sold the easterly half of said Crockett place. Chase Crockett never claimed any interest in the easterly half.

Chase Crockett died January 3, 1864, never having had any children. Sarah Crockett has descendants living.

The plaintiff claims to recover one fourth of the demanded premises as one of the four lawful heirs of Joshua Crockett, jr., according to the will of Joshua Crockett, senior, and, if competent, proposes to offer evidence in the acts and declarations of Joshua Crockett, senior, and also of Chase Crockett, tending to prove it to have been the intention of said Joshua, senior, in executing the clause of his will relating to the farm, of which the demanded premises constituted part, to give to his two sons, Joshua, jr., and Chase, a life estate only in said farm, without any power to convey said premises and the reversion thereof to their children after they were both dead.

The defendants claim to hold the demanded premises by virtue of the devise in said will, the conveyance thereof by Joshua Crockett, jr., to Chase Crockett, Sept. 30, 1844, by Chase Crockett to Robinson and Chase, Sept. 28, 1846, and mesne conveyance from said Edward Chase to Cate, the other defendant, and occupation in accordance with said claim of title, from the death of Joshua Crockett, senior, in January, 1815, which they propose to prove.

The will of Joshua Crockett, senior, and any deeds mentioned in this agreement may be referred to in the argument as part of this case.

Judgment to be rendered according to the opinion of the court upon the foregoing case, or the case to be discharged and remitted to the trial term for a trial before the jury if in the opinion of the court the result could be changed by evidence from either side on the points proposed to be proved by them.

*E. A. Hibbard*, for the plaintiff.

The first question to be ascertained is, what was the intention of the testator? The intention to give only a life estate to the two sons is apparent.

The word "heirs" in the bequest in controversy must be construed to mean "children." *Ellis* v. *Essex Merrimack Bridge*, 2 Pick. 247;

*Bowers* v. *Porter*, 4 Pick. 207.    If it should be construed as meaning heirs in the legal sense it would make nonsense of the bequest, because the Rawlins children, who were to take if Joshua and Chase left no lawful heirs, would themselves be lawful heirs after the death of Joshua and Chase leaving no children, unless their mother were then living; in which event she would be a lawful heir.

Upon the question of intention, *Bowers* v. *Porter*, before cited, is precisely in point.    If his intention was that his sons should not be able to convey it away from the Rawlins children, provided his sons left no children, then it must, of course, have been his intention that they should not be able to convey it away from their own children if they left any.

This clause is to be construed as if it read "to be equally divided between them *during their lives*, and *after their decease between* their heirs."    Something must be supplied, because no one could suppose the testator intended that the farm should be "equally divided between *them* and their heirs," which could only be done while Joshua and Chase were living.    It being evident that the sentence as it stands is incomplete, what words can the defendant supply to make it complete?    This is not a devise to the two sons and their heirs.    It is expressly stipulated that the farm *shall be equally divided* between the heirs, i. e., children.

The intention to give only a life estate to Joshua and Chase being clear, the question arises, shall this intention be carried out or shall it be defeated by "the policy of the law?"    Upon this branch of the case there appear to be serious difficulties, but upon a critical examination of authorities they will disappear.    If defeated at all it can only be by virtue of the rule in *Shelley's Case*.    It seems, indeed, that this was "merely a rule of interpretation," and to be controlled by the manifest intent of the party, in the opinion of such jurists as Mansfield, Blackstone and Story. 4 Gr. Cru. Dig. 381, note.    But suppose it to be "an inflexible rule of property," and conclusive upon the question of intent, this case is not affected.

If the remainder was to those who should be the children of Joshua and Chase at their decease, the rule in *Shelley's Case* does not apply. *Bowers* v. *Porter*, before cited; see pages 204, 205.    See also 6 Gr. Cru. Dig. 345, note 1.    Neither Joshua nor Chase had any child prior to the death of the testator.    If they had it would not have altered the result, because those only would take who were living at the termination of the life estate.    *Olney* v. *Hull*, 21 Pick. 314 ; *Holm* v. *Low*, 4 Met. 200 ; *Richardson* v. *Wheatland*, 7 Met. 169.

The word "heirs," i. e., children, is used in this clause as a mere *descriptio personarum*, and so the rule in *Shelley's Case* does not apply. *Wild's Case*, 6 Rep. 17 ; 4 Kent's Com. 221 ; 2 Gr. Cru. Dig. 235, sec. 34; 4 Ib. 389, sec. 28 ; 6 Ib. 355, sec. 39, 356, secs. 43, 44, 463, sec. 55, 464, sec. 57 ; 2 Wash. R. P. 273, sec. 16 ; *Richardson* v. *Wheatland*, 7 Met. 175 ; *Wight* v. *Baury*, 7 Cush. 107 ; *Dennett* v. *Dennett*, 40 N. H. 502.

The remainder over to the Rawlins children, who might or might not

be among the heirs of Joshua and Chase, is another reason why the rule in *Shelley's Case* should not apply. There are authorities to the effect that this could not prevent the application of the rule, but it may be safely affirmed that this is not sound law. If there had been a devise to Joshua and Chase for life, and then to the Rawlins children, the rule in *Shelley's Case* clearly could have no application, because the remainder would not be to heirs of the body, nor to heirs at all. The theory of the rule was that it must be understood that the party intended that the estate should go in a certain line of succession, and that the heirs should take by descent, the effect of which, according to the rule, was to give an estate of inheritance to the first taker. But suppose a devise to one for life, and then to the heirs of his body, or if none to third persons, thus making "a distributive direction incompatible with the ordinary course of descent," this theory falls, because the intent is not that the estate shall at all events go to the heirs. Suppose Joshua and Chase had both died, without alienation and without issue, during the life of their sister Sarah; is it not clear that the Rawlins children would then have taken as purchasers under the will, instead of their mother and the other heirs taking by descent from her brothers? And if Joshua and Chase would then have taken but a life estate, how can they take more now?

The case of *Smith* v. *Chapman*, 1 Hen. & Mumf. 240, as cited in 6 Gr. Cru. Dig. 356, note 1, is a decisive authority for the plaintiff. It must have been decided in spite of the rule in *Shelley's Case*, which was in force in Virginia until 1849. 2 Wash. R. P. 274, note 5.

If the refinements and subtleties of legal learning in by-gone ages, which have been legislated out of existence in this State since the time of this will, shall be found insufficient to enlarge the interest of Joshua and Chase Crockett beyond a life estate, the title of the defendant fails. The remaining question will then be, who shall take the remainder, the Crockett or the Rawlins children?

There can be little doubt that the testator intended that the farm should go to the children of the two sons, or of either of them, and only to the Rawlins children in the event that both died without children; and it is not improbable that he intended that after the death of Joshua or Chase, the survivor should have a life estate in the whole property. And although they took as tenants in common, there seems to be nothing in the way of adopting this construction, because the survivor, without having any right of survivorship as a joint tenant, might well take his brother's half for life as a purchaser under the will. On this construction no part of the remainder would take effect until the death of the survivor.

But if the legal effect of the language employed was to divest one half of the remainder on the death of Joshua, the result will be the same. Joshua and Chase never made any lawful partition; but if they had, it could not reach beyond their lives. If, therefore, anything vested in the children on the death of Joshua, it must be an undivided half of the whole, and not any part in severalty, which would cut down the plaintiff's interest in the land in controversy from a fourth to an eighth.

The conclusion, therefore, must be that the plaintiff is entitled to recover the undivided fourth part which he demands.

*A. & F. A. Fowler,* for the defendant.

PERLEY, C. J.   The demandant maintains that, inasmuch as Chase Crockett died without children, or lineal descendants answering to the term of "lawful heirs," in the sense of that term as used in the will, the intention of the testator was that upon the death of Chase Crockett the estate in all the land should vest in the persons who were the lawful heirs of Joshua Crockett at the time of his death.   To reach this result we must read the will to mean that during the joint lives of Joshua and Chase Crockett they should have an estate in common; for the farm is to be equally divided between them, which, even without the aid of our statute, would clearly imply an estate in common, and not in joint tenancy; and it is also to be equally divided, not among, but between, their heirs; which would evidently mean, taking the whole clause together, that the heirs of Joshua and Chase Crockett were not to take *per capita,* but that the heirs of each were to take one half.   That, upon the death of one tenant in common, the survivor should hold all the land till his death.   That, on the death of the survivor, if they both left lawful heirs at the time of their decease, the land should be equally divided between the lawful heirs of both.   That, if one died without lawful heirs, the lawful heirs of the other should, on the death of the survivor, take all.   That if, as happened in fact, the survivor died without lawful heirs, the whole should go to those who were the lawful heirs of the tenant that died first at the time of his decease.   That if both died without lawful heirs, the children Sarah Crockett had by Thomas Rawlins should on the death of the survivor take the whole farm.

This construction involves such complication and intricacy of disposition, as we find it impossible to suppose the testator could have contemplated when he employed the language of this will.

On this part of the case the other view of the testator's intention is that each of the two sons should take an undivided half of the farm for life; that if he left lawful heirs, his half should go to them, if not, to the children Sarah Crockett had by Thomas Rawlins.   This is plain and simple, and so far as we can perceive, no way unreasonable or unnatural.   Nor by this construction is any violence done to the language of the will.   The land is given to Joshua and Chase Crockett and their lawful heirs; the term *their heirs* is taken distributively, as is often done in like cases; that is to say, the heirs of each take his share. This is precisely what is done under our statute when a conveyance is made to two or more and their heirs; the estate is a tenancy in common, and the heirs of each take his share.   Rev. Stat. ch. 129, sec. 2.

It may be noted, that, by the will, if the two sons leave no lawful heirs, the *farm* is to be equally divided between the children of Sarah Crockett; from which an argument might be drawn that the whole farm was intended to go to her children upon such failure of lawful heirs as was contemplated by the will, and not one half of it upon the death of

either son.   But the same distributive construction may well be applied
to this provision of the will, and the argument from that expression is
not sufficient to control the effect of the other provisions.   In the view
which we take of the case, it perhaps was not necessary to determine
this point, but such, we think, is the meaning of the will; and having
established this as the testator's intention, may help to simplify our
further inquiries.

According to this intention of the devisor, on the death of Joshua
Crockett his half would go to his lawful heirs, and the half of Chase
Crockett on his death to the children of Sarah Crockett.   Taking this
view of the case we may lay the devise to Chase Crockett out of the in-
quiry, unless perhaps the general language of the devise may be sup-
posed to assist in explaining the further intentions of the testator.   The
devise in question will then read substantially as follows : "I give one
undivided half of the farm to Joshua Crockett, and, if he have any
lawful heirs at the time of his decease, to such heirs; but if he have no
lawful heirs at the time of his decease, I give his half to the children
Sarah Crockett had by Thomas Rawlins."

If this were to be regarded as a devise to certain persons who were
the lawful heirs of Joshua Crockett, and they took directly as purchasers
from the devisor, and there had been nothing to qualify the devise to
them, they would take a fee simple under our statute.   Comp. Stat.
400, sec. 4.   But it is plain that this was not the testator's intention,
and that by "*lawful heirs*" he did not mean the heirs general of Joshua
Crockett, because the children of his daughter Sarah, to whom the re-
mainder is limited, would, in default of others, be the lawful heirs of
their uncle Joshua.   The term *lawful heirs* must therefore be restrict-
ed in construction to his heirs in the line of descent.

On looking at the different provisions of this will we are easily led to
the conclusion that the actual intention of the testator was to give Josh-
ua and Chase Crockett an estate for life only, and that he did not in-
tend they should have power to dispose of the inheritance.

The demandant contends that, by the term lawful heirs, the testator
meant children of Joshua and Chase Crockett as a personal designation ;
not the children that they had at the time when the will was made; for
in the express language of the will the lawful heirs were to be such as
they might have at the time of their decease.

The words "heirs or lawful heirs" used in a will must be construed in
their legal and ordinary sense unless other provisions of the will show
that the testator meant other persons than those who would be heirs in
the legal sense.   There may be qualifying words which show that the
word *heirs* in a will was used to designate certain persons who would
take as purchasers and not as heirs of the first taker.   But in such case,
to have that effect, the qualifying words must describe an estate descend-
able in a different course and to different persons as special heirs from
what the first term would carry the estate to.   The term must be read
as a mere designation of one or more individuals, or a new import given
to it by superadded or engrafted words of limitation varying its sense
and operation in order to make it a word of purchase.   It must appear

that the word "*heirs*" was used to designate some other persons than the heirs at law of the first taker. To change the term into a word of purchase the heirs must not be able to take as heirs by reason of a distributive direction incompatible with the ordinary course of descent, or the limitation must be directed to the then presumptive heirs of the person on whom the life estate is limited. 2 Cruise, 296; 2 Jarman, 247; 4 Kent's Com. 214, 222; *Denn* v. *Puckey*, 5 T. R. 299, 306.

It is plain that the testator had not in his mind any particular individuals, whom he meant to designate by the name of *lawful heirs*, for the lawful heirs were to be such as Joshua and Chase Crockett might have at the time of their decease, and it is stated by the plaintiff's counsel in argument, though not found by the case, that neither Joshua or Chase Crockett had any child prior to the death of the testator. And we find it quite impossible to suppose that in using the term "lawful heirs" the testator meant children in such an exclusive sense as should shut out a grandchild, whose parents were dead, and who would be in fact and in law one of the lawful heirs of his or her grandfather in the right line of descent. Suppose that Joshua Crockett had an only son and only child, who died in the life time of his father, leaving children, who would in that case be the lawful heirs in the line of descent of their grandfather; the proposition must be regarded as too extravagant for serious discussion, that, by the term *lawful heirs*, the most appropriate general term to include such grandchildren, the testator meant to exclude them. Suppose, again, that Joshua Crockett had left children and also children of a child who was dead, and who would thus be lawful heirs of Joshua Crockett, and answer exactly to the description in the will, it would hardly be contended, that, in using a term which plainly included them, the testator meant to cut off such of the heirs of Joshua Crockett as were his grandchildren. The presumption is so strong against an intention to cut off grandchildren, who are children of a deceased child, that even where the word "children" alone is used, there are numerous cases in which it has been held that grandchildren would be included and take the share of a deceased child. 2 Jarman, 37, 69, 73. If, for instance, Sarah Crockett had a grandchild by a child of Thomas Rawlins, but no child living, on the authority of these cases, the grandchild would take under the term "*children*" used in this will.

If, therefore, we are to understand that the testator, by the term "lawful heirs," meant to designate such persons as should be the lawful heirs of Joshua Crockett at the time of his death, we must suppose that he meant to include all persons who were such heirs in the line of descent, whether children or the representatives of deceased children. The grandchildren, whose parent was dead, would be lawful heirs, and were intended to take under the will, and the intention must have been that they should take the share of their deceased parent. For they would be lawful heirs to what? Clearly to the share of their deceased parent. Such is the legal and ordinary import of the term "lawful heirs," and

there is nothing in the will from which we can gather a different intention.

The rule in *Shelley's Case* was adopted in this State as part of the common law and remained in force here till, as to devises, it was abolished by statute in 1843 ; Comp. Stat. 400, sec. 5 ; *Dennett* v. *Dennett*, 40 N. H. 505 ; and the main question in the present case is whether that rule applies to these provisions of Joshua Crockett's will, who died in 1815.

By that rule where an estate is limited for life to a person and the same instrument contains a limitation of an estate of the same legal or equitable quality to the heirs of the same person, or the heirs of his body, the word heirs is a word of limitation and not of purchase, and the whole estate of inheritance, whether a fee simple or fee tail, vests in the ancestor.  *Shelley's Case*, 1 Rep. 93, 104 ; 2 Jarman on Wills, 241 ; 1 Preston on Estates, 263, 419.

In the construction of wills the question whether this rule applies does not depend on the technical language used, but on the nature of the estates created and disposed of.   Though the word "heirs" is used, yet, if looking to the whole will, it appears that the testator by that term intended to designate certain persons different from the legal heirs of the first taker, or that the persons, who might be his heirs, should take a different estate from that which they would take as his heirs by descent, the rule does not apply.   And, on the other hand, the rule cannot be evaded, if an estate is in fact to go to the first taker for life and then to his heirs, who take as a class and transmit the estate in the line of descent.   4 Kent, 221, 274 ; *Bowers* v. *Porter*, 4 Pick. 198, 193, 205 ; 2 Jarman on Wills, 241, 247 ; 2 Cruise, 296.

In the construction, which, after careful consideration we have given to this will, the intention of the testator was that an estate in one undivided half of the land should go to Joshua Crockett for his life, and then to his heirs in the line of descent as a class ; that is to say, the persons who might be his heirs in the line of descent were intended to take the same estates respectively that they would take as his heirs by descent ; that under the term "lawful heirs" must be included the whole heritable blood of Joshua Crockett, and we find the actual intention of the testator to have been that Joshua Crockett should take an estate for his life only, and should have no power to dispose of the inheritance. It is upon a devise of such intended operation that we are called on to decide whether Joshua Crockett took an estate of inheritance or for life only.

In determining whether the rule in *Shelley's Case* shall apply, it is not material to inquire what the intention of the testator was as to the quantity of estate that should vest in the first taker.  If the limitation were to *A* for life, remainder to his heirs in fee simple, without other qualifying words, the actual intention would undoubtedly be that *A* should take an estate for life only and have no power to dispose of the remainder in fee, and negative words saying that *A* should take for life only would add nothing to the clearness of the first words.   The material inquiry is, What is taken under the second devise ?  If those, who

take under the second devise, take the same estate that they would take as his heirs or as heirs of his body, the rule applies. However clear the intention may be to create an estate in *A* for life, remainder to his heirs, so that the estate shall go to those persons, who are the heirs of *A*, and descend to his heritable blood in line of descent, the policy of the law, which established the rule in *Shelley's Case*, did not allow such a limitation. By that rule no person was permitted to raise in another an estate of inheritance, and at the same time make the heirs of that person purchasers. 6 Cruise, 325, 326, 328; Fearne on Con. Rem. 196; Hargrave's Tracts, 551; 4 Kent, 208, 214; *Denn* v. *Puckey*, 5 T. R. 299, 303; *Richardson* v. *Wheatland*, 7 Met. 172.

In *Bowers* v. *Porter*, 4 Pick. 198, cited for the plaintiff, the effect of this rule is stated thus: "By the rule laid down in *Shelley's Case*, which is now an undisputed part of the common law, however manifest may be the intention of the testator to give only a life estate to his daughter, if by the same instrument he devise the remainder to her heirs generally, after her decease, the daughter shall take a fee; that is, her heirs shall take by descent and not by purchase, the whole estate being in her so that she can alienate or devise it at pleasure; for although the testator intended to deprive her of the power of alienation, yet as it was clearly his intention to vest the whole estate in her and her heirs, the policy of the law will prohibit this restriction upon the right of alienation." And, in *Brandt* v. *Gelston*, 2 Johns. Cases, 384, 389, *Kent*, *J.*, says: "It being once ascertained that the grantor did not use the word heirs for any particular persons, in that instance inaptly denominated 'heirs,' but intended by it, as *nomen collectivum*, the line of inheritable succession, then I agree that the rule in *Shelley's Case* applies with irresistible control."

By the term "*lawful heirs*" used in this will, we have been unable to find that the testator intended to designate any different persons from those who should be the heirs of the body of Joshua Crockett at the time of his death; we think that the intended limitation would carry the estate to the heirs of the body of Joshua Crockett as a class including all his heritable blood; that the actual intention of the testator was to give an estate in an undivided half of the land to Joshua Crockett for life, remainder to the heirs of his body, and that by the well-established and now familiar interpretation of the rule in *Shelley's Case*, an estate of inheritance, contrary to the intention of the testator, vested in Joshua Crockett.

Whether the estate of Joshua Crockett was regarded as an estate in fee simple or in tail, his deed barred all remainders and reversions under our statute. Rev. Stat. ch. 129, sec. 1. Estates tail, however, were abolished when this will was made, and Joshua Crockett took an estate in fee simple. *Jewell* v. *Warner*, 35 N. H. 176.

We shall not undertake the task of commenting on all the numerous authorities cited by the counsel on both sides, but content ourselves with making a few remarks on some of those which appear to have been most relied on by the plaintiff.

In *Ellis* v. *The Essex Merrimack Bridge*, 2 Pick. 247, the court

held that, looking to the different provisions of the will, it was evident that by the word "*heirs*," the testator meant children, which we do not find to have been the intention of the testator in the present case.   Besides there was in that case no question as to the application of the rule in *Shelley's Case*, as the will was proved in 1806, and the rule as to devises was abolished in Massachusetts by their statute of 1791.

In *Bowers* v. *Porter*, 4 Pick. 198, the testator gave the improvement of the land in question to Lydia Bowers, and provided that the premises should be equally divided between all her heirs at her decease, and it was held that by virtue of the statute of 1791, ch. 60, sec. 3, Lydia Bowers took an estate for life only, and that her children living at the testator's death took a vested remainder.   In delivering the opinion of the court, *Parker*, *C. J.*, says : "The principle seems to be clearly settled that although a testator may evidently have intended to give only a life estate to his first devisee, yet if it also clearly appears that he intended a remainder either in fee or in tail should at all events go to the heirs, sons, or children of the tenant for life, his particular intention shall give way to that which is more general, and the estate under the devise shall be held accordingly.   The case before us is of a nature to be governed by this principle.   The testator devised to Lydia Bowers an estate in land, which at her death was to be equally divided among all her heirs.   This was merely providing for such a distribution as would take place under our laws, if he had by express terms given a fee to his daughter.   But he intended without doubt to restrain her from alienating it by deed or devise ; this, the policy of the law will not allow, but by the principles of the common law the whole estate would vest in Lydia Bowers ; and this would be the state of the case, but for the statute of this Commonwealth of 1791, ch. 60."

It thus appears that this case of *Bowers* v. *Parker* was decided "by virtue" of the Massachusetts statute which abolished the rule in *Shelley's Case*, and under that rule the estate of inheritance, it is clear, would have been held to have vested in Lydia Bowers.   Certainly that case cannot be regarded as an authority for the plaintiff upon the question whether the rule in *Shelley's Case* applies to the devise which we are considering ; on the contrary it would seem to be strongly in point the other way.

In *Wight* v. *Baury*, 7 Cush. 105, the devise was to the daughter of the devisor for life, and then to her child or children lawfully begotten, their heirs and assigns forever, and if he should leave no child, then to be equally divided among the grandchildren of the devisor.   The will in this case was made and proved before the statute of 1791, and while the rule in *Shelley's Case* was in force there.   But the intention was quite plain to break the line of descent, because, if the daughter left no child, the land was to go to the devisor's children, who might or might not be heirs of her daughter, and the remainder was limited to the children and not to the heirs of the first taker.   It may be observed that all the cases cited from Massachusetts, except this of *Wight* v. *Baury*, were upon the construction of devises made after their statute of

1791, and no question arose in them as to the application of the rule in *Shelley's Case*.

In *Smith et ux* v. *Chapman*, 1 Hen. & Mumf. 240, decided in 1807, the devise was to William Carr, the devisor's son, during his natural life, and after his decease to his *child or children*, and if he had none, to John Carr and Betsy Tebbs for life, and then to be equally divided between their children. The case appears to have turned on the distinction between the word "heirs" or "issue," and the word "*child or children*" used in that will. *Tucker, Judge,* says: "The counsel contend that as the words *issue* and *children* both mean the same thing in a natural sense, they are to be taken as meaning the same thing also in a technical sense, and hence infer that whenever an ancestor takes an estate in freehold, and in the same will there is a limitation over to his children, the children shall not take as purchasers. I have not met with a case where in a devise by way of remainder the word *children* had the same sense applied to it as *heirs of the body;* that is, designating them as takers of an estate of inheritance. Here the analogy between the words *issue* and *children* seems to fail. There is not in the whole will a single technical word that I can discover. The word *children,* therefore, is to be taken in its natural sense, and cannot be strained to mean *heirs.*"

The attempt in *Smith* v. *Chapman* was to give the word *children* in the devise the same meaning and effect as the word "*heirs*" or "*issue;*" and it appears to have been agreed on all hands, that, if the word *heirs* had been used, as in the present case, instead of the word *children,* an estate of inheritance would have vested in the first taker by operation of the rule in *Shelley's Case*.

*Judgment for the defendant.*